## MORRIS v. CHESAPEAKE & O. S. S. CO.

(District Court, S. D. New York.   October 8, 1903.)

1. CONTRACTS—PERSON ENTITLED TO SUE FOR BREACH—UNDISCLOSED PRINCIPAL.

    The real principal for whose benefit a contract was made is entitled to avail himself of the contract, even though the other party had no knowledge that there was an undisclosed principal.

2. SAME—CONTRACT FOR CARRIAGE OF CATTLE—RIGHTS OF ASSIGNEE.

    A contract for the carriage of cattle on certain vessels is assignable by the shipper, and the assignment vests the assignee with the right to sue thereon in his own name, notwithstanding a provision therein that no part of the space contracted for shall be sublet without the consent of the shipowner.

3. SAME—CONSTRUCTION—VESSELS "ALL SAILING."

    A contract by a steamship company for the carriage of cattle on certain specified vessels, "all sailing" during certain months, imports a warranty that all the vessels named will sail during such months.

4. SAME—PAROL EVIDENCE TO VARY.

    Where such contract makes no distinction between the several vessels named, it cannot be changed by parol evidence to except one from such warranty.

5. SAME—RIGHTS OF UNDISCLOSED PRINCIPAL — EQUITIES EXISTING BETWEEN APPARENT PRINCIPALS.

    Where an undisclosed principal comes in and avails himself of the contract, he must do so subject to existing equities between the apparent principals; and a claim for demurrage existing in favor of a steamship

¶ 1. See Principal and Agent, vol. 40, Cent. Dig. §§ 502, 503.

company against a shipper with whom a contract for further shipments is made may be set off against similar claims arising against the company under such contract, although the latter was in fact made by the shipper on behalf of another who made the shipments thereunder, and in whose favor the claims arose.

In Admiralty. Action to recover damages for breach of contract.

Opdyke, Willcox & Bristow, for libellant.

Convers & Kirlin, for respondent.

ADAMS, District Judge. This is an action which was brought by the libellant to recover from the respondent damages arising out of an alleged breach of contract made between the respondent and Schwarzschild & Sulzberger Company and J. Shamberg & Son and assigned to the libellant. The contract was in writing and is as follows:

"Chesapeake & Ohio Steamship Co., Ltd., Agents.

Special Live Stock Contract.

New York, Oct. 19th, 1899.

Messrs. Schwarzschild & Sulzberger Co. and J. Shemberg & Son—Dear Sirs: We offer, as Agents of Chesapeake & Ohio S. S. Co. Ltd. and owners, and not on our own behalf, to let you suitable space as undernoted, for the transportation of live cattle, that is to say: On the Steamers named in margin intended to be dispatched about Sailing dates as per margin from Newport News, Va., U. S. A. to the Ports named in margin, for 350 head of cattle excepting 'RAPIDAN' and 388 head for S. S. 'RAPIDAN', at the rate of Twenty-seven shillings and six pence Sterling per head. Freight to be paid as customary at destination.

It being stipulated that no responsibility is to attach to the vessel, her owners or her agents, for loss arising from delay in receiving or shipping, or from the Steamer not being ready to embark the animals, or for loss or damage when caused either directly or indirectly by the act of God, the Queen's enemies, strike, mobs, quarantine, insufficiency or defect in fittings, lighterage to or from the vessel, trans-shipment, explosion, heat, fire at sea or on shore, perils or accidents of the seas, rivers and navigation, or arising from boilers, steam, machinery, pumps or pipes of any kind (including consequence of defect therein or damage thereto), collision, stranding, heeling over, upsetting, submerging or sinking of ship in harbor, river, or at sea, however these or any of them may be brought about, or from admission of water into the vessel, whether this shall arise from any of the before mentioned causes, or from any act of omission, negligence, default or error in judgment of the pilot, master, mariners, engineers, stevedores, or other persons in service of the shipowner's occurring previously to the vessel's sailing, or by unseaworthiness of the ship at or after the commencement of the voyage (provided all the reasonable means have been taken to provide against such unseaworthiness); the other conditions being as customary with us, and as expressed in our form of Live Stock Bill of Lading, a copy of which is hereupon endorsed, and which forms part of the Special Live Stock Contract. No other cattle to be carried.

You are not to sub-let any part of the space referred to in this Contract, without our previous consent, nor until the party to whom you propose to sub-let has signed and delivered to us an undertaking to be bound to all the terms and conditions herein specified, it being understood that you are responsible for the due observance of such undertaking. It is also provided that we shall not be required to give any notice when to ship, except to you, that you are not, under any circumstances, to be relieved from any part of your obligation under this Contract; and that neither ourselves nor the Owners of the Steamship assume any obligations whatever to the party to whom you may sub-let. Bills of lading to be issued at New York as soon as cattle are loaded.

It is distinctly understood and agreed that under no circumstances will cattle be carried free, through the process of crowding a few extra heads in the spaces required for a less number, the freight being payable per head.

Six days' notice to be given you of the date when the steamer will leave Newport News, and the cattle are to be in Newport News, ready for shipment by the time called for, otherwise usual demurrage to be paid the Steamer. And if the cattle are detained in Newport News, detention to be paid for at the rate of 50 cents per head per day.

In consideration of the Shippers engaging the spaces on the above named Steamers, Agents give Shippers the option to be declared on or before April 15th, 1900, of taking the cattle spaces, conditions as above, on their Steamers sailing from Newport News to Liverpool and London for the months of May, June and July, 1900, at 30/- Sterling per head. Should Shippers declare as their option that they will take the spaces for the additional period named above then a new contract shall be made containing an option to the Shippers for a further period of three months on the same terms, option to be declared on or before the fifteenth day of the last month covered by the contract. This arrangement to continue for all the months of the year 1900 in periods of three months each unless Shippers should at any time not avail themselves of their option when this agreement is to terminate.

Shippers have option to be declared upon receipt of the six days' notice of Steamers readiness to receive of declining to ship cattle in which case they shall pay the Steamship Company upon sailing of the Steamer from Newport News one-half of the freight on the cattle in full settlement of dead freight, in which case also no other cattle to be carried.

* * * accept the above offer, and hereby agree and bind * * * to ship the number of animals called for on the terms and conditions there stated.          P. Pro Furness, Withy & Co., Ltd.,
                                   Geo L Woolley, Agents."

(Written across the face)
     "Accepted Each firm Shipping
          one half &
               signed severally
     not jointly.          J. Shamberg & Son.
                    Schwarzschild & Sulzberger Company.
                                   P. Joseph,
                                        Vice Prest."

(Written on left-hand margin)
"Nothing contained herein shall be construed to relieve any Manager, Agent, Master or owner from any liability which it is made unlawful to contract against by C. 105 of the Acts of the 52d Congress of the United States, approved February 13, 1893, but they shall have the benefits of all the exemption for liability conferred by the Act."

(Written on right hand margin)
     "S. S. 'Rapidan.'                All sailing during the months
     S. S. 'Shenandoah.'              of December, 1899, January,
     S. S. 'Rappahannock.'            February, March, April, 1900,
     S. S. 'Greenbrier.'              for London and Liverpool.
     S. S. 'Chickahominy.'
     S. S. 'Appomattox.'
     S. S. 'Kanawha.' "

The libellant became the principal by the assignment and the said original parties became his agents in the fulfilment of the contract.

Numerous shipments of cattle were made under the contract for the benefit of the libellant whose acts tended to show a recognition by the respondent of the libellant as the principal in the transaction.

On or about April 5, 1900, the said agents notified the respondent that the option provided for in the contract to continue the contract during the months of May, June and July, 1900, would be exercised. The option for the months of August, September and October, 1900,

was also exercised by notification on or about July 10, 1900, and the option for November and December, 1900, was exercised by notification on or about October 5, 1900.

## First Cause of Action.

On or about January 27, 1900, the respondent gave notice to the libellant that the steamer Chickahominy had been fixed to sail from Newport News on February 2, 1900, and the libellant procured and had in readiness for shipment on that vessel 351 head of cattle on the day appointed, but the steamer did not sail until February 6, by reason of which detention the libellant claims damages at the rate of 50c. per day per head, amounting to $702.

## Second Cause of Action.

On or about February 20, 1900, the respondent gave notice to the libellant that the steamer Greenbrier had been fixed to sail from Newport News on February 26, 1900, and the libellant procured and had in readiness for shipment 351 head of cattle on the day appointed, but the steamer did not sail until February 28, by reason of which detention the libellant claims damages at the rate of 50c. per day per head, amounting to $351.

## Third Cause of Action.

On or about February 24, 1900, the respondent gave notice to the libellant that the steamer Rappahannock had been fixed to sail from Newport News on March 3, 1900, and the libellant procured and had in readiness for shipment 359 head of cattle on the day appointed, but the steamer did not sail until March 5, by reason of which detention the libellant claims damages at the rate of 50c. per day, amounting to $359.

## Fourth Cause of Action.

The libellant claims that the respondent at all times during December, 1899, and throughout the entire year 1900, failed to furnish cattle space or to carry any cattle upon the steamer Rapidan, although she made seven trips across, on each trip carrying live cattle and freight at rates greatly in excess of those fixed by the contract with the libellant; that during said period the libellant had in readiness for shipment cattle sufficient to fill the space on the steamer reserved under the contract, whereby libellant suffered damages to the extent of $40,000.

The respondent, answering the libel makes some formal denials and avers that the arrival of the Chickahominy was delayed by sea perils until February 1, 1900, and all reasonable diligence was used to dispatch the steamer as soon as practicable thereafter and no liability for demurrage on the cattle accrued.

The answer to the second cause of action, after denying the formal allegations, avers that the arrival of the Greenbrier was delayed by sea perils until February 25, and all reasonable diligence was used to dispatch her as soon as practicable thereafter and no liability for demurrage has accrued.

The answer to the third cause of action denies the allegations of the libel.

The answer to the fourth cause of action makes some formal denials and avers that there were no sailings of the Rapidan during December, 1899, or during 1900, and that it was not in contemplation of the parties that the contract should attach unless the vessel sailed in the respondent's service, which she did not, and that in October, 1899, Furness, Withy & Co. Ltd., as agents of the respondent, entered into a live stock contract with Schwarzschild & Sulzberger Co. and J. Shamberg & Son, with certain steamers mentioned in the margin, the Rapidan being one of them, but that it was understood and agreed between the parties prior to the execution of the contract that the Rapidan was not a vessel belonging to the respondent or regularly running in its line, but that she was temporarily chartered and would not be one of the vessels "sailing during the months" above stated unless her charter was continued and that if it was not and if the vessel did not run in respondent's service during the currency of the cattle contract, or any renewal of it, the contract should not be deemed to apply to or include her cattle spaces in any way. It is further averred that the vessel with the knowledge of Schwarzschild & Sulzberger Co. and J. Shamberg & Son was taken on time charter by the British Government prior to the signing of the contract and that her name was included in it only on the faith of the agreement and understanding that it would attach to her only in the event of her return to the respondent's service and that in fact the steamer never came back into the respondent's service during the currency of the cattle contract in question and never was a vessel to which the contract or any renewal of it attached.

The contentions advanced by the respondent are:

1st. That the libellant has not proved any privity with the respondent entitling him to maintain this action in his own name.

The evidence shows that the respondent knew with whom it was dealing. Certain correspondence took place between the libellant and his assignors of which the respondent was apprised and there was some direct dealing between the libellant and the respondent, in the shape of bills of lading for some of the shipments made. The libellant to the knowledge of the respondent, was operating in the name of the Morris Beef Company, Ltd., and many of the shipments were by that company and the respondent collected demurrage from the libellant upon at least one shipment. The inference that he knew of the relation of the parties to the contract is irresistible.

Moreover, the real principal was entitled to come in and avail himself of the contract made for his benefit, even though the respondent did not know there was an undisclosed principal. New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. 344, 378, 380, 12 L. Ed. 465; Ford v. Williams, 21 How. 287, 16 L. Ed. 36; Baldwin v. Bank, 1 Wall. 234, 17 L. Ed. 534; Prichard v. Budd, 76 Fed. 710, 22 C. C. A. 504.

The situation is not changed by the provision in the contract that none of the space should be sub-let. The contention of the respondent is, that in view of such provision, the libellant could acquire

no rights in the contract, but the difference between sub-letting and assigning is material. In the one case, the lessee claims the whole or a part of the premises he is entitled to occupy. In the other, he transfers all his right in a contract and the assignee acquires all the rights and assumes all the liability of the assignor. Lynde v. Hough, 27 Barb. 415; Bedford v. Terhune, 30 N. Y. 453, 86 Am. Dec. 394; Field v. Mills, 33 N. J. Law, 254.

2nd. The respondent is not liable for having offered cattle space on the Rapidan.

The respondent's contention is that the words "all sailing" during the months covered by the contract, should be read "all that may sail." In my opinion, the expression should be held to import a warranty that all would sail. Any other view seems to me to be inconsistent with the plain intention of the parties, as shown by the terms of the contract. There is nothing in the contract to distinguish the Rapidan from the other steamers, about which liability for, by the respondent, there is no dispute. The contract is unconditional and unambiguous and can not be destroyed by parol evidence. Bast v. Bark, 101 U. S. 93, 97, 25 L. Ed. 794; De Witt v. Berry, 134 U. S. 307, 315, 10 Sup. Ct. 536, 33 L. Ed. 896; Seitz v. Brewers' Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837; Van Winkle v. Crowell, 146 U. S. 42, 13 Sup. Ct. 18, 36 L. Ed. 880; Corse v. Peck, 102 N. Y. 513, 7 N. E. 810; Thomas v. Scutt, 127 N. Y. 133, 27 N. E. 961.

3rd. The claims for demurrage due to the respondent from Schwarzschild & Sulzberger Co. and J. Shamberg & Son are admissible as set-offs in this suit.

The respondent's contention in this regard is entitled to more consideration. It is claimed that there is due to the respondent some £1500 for demurrage arising out of transactions between it and the assignors prior to this contract. The claims are before the court and can be dealt with conveniently in this action. The parties stand in the position they would have stood if the assignors had really been principals. Montagu v. Forwood, Law Repts. 2 Q. B. Div. 1893, p. 350; Taintor v. Prendergast, 3 Hill, 72, 38 Am. Dec. 618.

I do not find that the defences should be sustained except as to the demurrage last referred to.

Decree for the libellant, with an order of reference.